STATE of Missouri, Respondent,

v.

Jeremy WERNER, Appellant.

No. SC 81663.

Supreme Court of Missouri,
En Banc.

Jan. 11, 2000.

Rehearing Denied Feb. 8, 2000.

Leonard J. Frankel, Elaine A. Pudlowski, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for respondent.

Caterina DiTraglia, St. Louis, amicus curiae.

ANN K. COVINGTON, Judge.

Jeremy Werner, appellant, appeals from his conviction of involuntary manslaughter, section 565.024.1, RSMo 1994, for which he received a seven year sentence. Appellant claims that the trial court erred in refusing to suppress certain statements appellant

made on April 18, 1996, because (1) the police took appellant into custody and did not afford him the rights required by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and article 1, section 15 of the Missouri Constitution; (2) police officers seized appellant without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution, and article 1, section 19 of the Missouri Constitution; and (3) appellant's statements were obtained in violation of sections 211.059 and 211.061, RSMo 1994, because appellant was not given his *Miranda* rights and neither a parent nor a juvenile officer was present when he was questioned. After opinion by the Court of Appeals, Eastern District, this Court granted transfer. Reversed and remanded.

Viewed in the light most favorable to the verdict and the trial court's overruling appellant's motion to suppress, *State v. Rousan,* 961 S.W.2d 831, 845 (Mo. banc 1998), the facts are as follows: on the evening of March 15, 1996, appellant, then sixteen years of age, was at his home in St. Louis County with his sisters, Sarah and Nacol Werner, as well as Sarah's boyfriend, Greg Pancoast, and Nacol's fiancé, Brad Kohler. Sarah's two children, Brittany, then three-and-a-half years old, and her younger brother, Michael Jonas, then twenty-two months old, were also there. At approximately 9:00 p.m., appellant went downstairs to where Michael was sleeping, got into bed with him, and held Michael to his chest for approximately five minutes, until Michael started to choke and cough. Appellant released Michael, got off the bed, lying on Michael in the process, and went upstairs. Later, Pancoast heard Michael making "throwing up" noises and went to investigate. Pancoast administered cardiopulmonary resuscitation and summoned help. An ambulance arrived and transported Michael to a hospital, where he was pronounced dead shortly after arrival.

The night of Michael's death and the following morning, police officers questioned all members of the household who were at home on the evening of Michael's death. The officers believed that the death was suspicious. On April 9, 1996, the medical examiner ruled the death a homicide by mechanical asphyxiation.

On the morning of April 18, 1996, Detectives Fourtney, Berra, and Paul went to Hazelwood Central High School where appellant was a special education student; he had an I.Q. of 78 and functioned at a fourth-grade level. The detectives asked to speak with appellant and Nacol Werner about an "investigation." Daniel Fels, the assistant principal, brought appellant and Nacol to the school office. Detective Fourtney completed a form that stated he was taking "custody" of appellant and Nacol and "accept[ing] full responsibility for the care and custody of same." Detective Fourtney checked the box on the form that read "custody without notification." The form specified that a detective would notify appellant and Nacol's parents. Detective Fourtney told appellant and Nacol that the police were still investigating Michael's death and that the detectives wished to "interview them about the investigation." The detectives asked appellant and Nacol to go with them to the police station. They agreed to go. Detectives Fourtney and Berra accompanied appellant and Detective Paul accompanied Nacol. Appellant and Nacol were transported to the station in separate vehicles.

Upon arriving at the police station, Detectives Fourtney and Berra placed appellant and Nacol in separate rooms. The rooms could be locked only from the. inside. No one else was in either of the interview rooms. Other detectives retrieved Pancoast and Sarah from Pancoast's mother's house and transported them in separate cars to the police station. During the morning, a detective escorted appellant to the bathroom when he requested to use it. According to Detective Fourtney, for "logistics and convenience,"

he waited two hours until all of the individuals present in the house the night of Michael's death arrived at the station before he and Detective Berra began to question appellant. Detectives Fourtney and Berra did not restrain appellant before they questioned him.

Detectives Fourtney and Berra questioned appellant for approximately one hour. They did not read appellant his *Miranda* rights before they questioned him. The detectives told appellant that the case was a homicide and that they were trying to gather as many "details about the homicide" as possible.

Appellant told the detectives that Pancoast put Michael to bed and twice went back downstairs to retrieve some darts and clothes. Appellant said that Pancoast returned to the basement a third time to put Brittany to bed, whereupon Michael became sick. The detectives left appellant's interview room and went to the room where Pancoast was being interviewed. Pancoast stated that he returned to the basement only when he put Brittany to bed. Detectives Fourtney and Berra resumed their interview with appellant. They told appellant that Pancoast denied returning to the basement. Appellant then asked the detectives how Michael had died. Detective Fourtney told appellant that Michael had been suffocated. Appellant stated again that he "thought" Pancoast had gone downstairs. Detectives Fourtney and Berra left the room a second time and spoke with the police officer interviewing Sarah, who reported that Sarah denied having seen Pancoast go downstairs after putting Michael to bed. The detectives returned to appellant's interview room and told appellant that Sarah denied having seen Pancoast go downstairs. Detective Fourtney asked appellant again whether he had gone downstairs. Appellant admitted that he had gone downstairs. Detective Fourtney testified that when he

asked appellant what he did when he went downstairs, appellant said that he got into bed with Michael, held Michael's face to his chest for about five minutes until Michael started to choke and cough, and then released Michael. Appellant told Detective·Fourtney that he lay on top of Michael when he got off the bed, got his darts and clothes, and then went upstairs.[1] At that time, Detective Fourtney believed that appellant had incriminated himself and stopped the interview.

At the pretrial hearing on appellant's motion to suppress, Detective Fourtney testified that he was attempting to gather information when he interviewed appellant and did not ask guilt-seeking questions concerning the crime. Detective Fourtney did not say anything to appellant regarding an attorney or juvenile officer. Detective Fourtney testified that there were no restrictions on appellant's leaving the room or the station until after appellant incriminated himself. Appellant was not physically restrained in any way during the questioning. At no time did appellant ask to leave the police station. Detective Fourtney located appellant's mother after appellant incriminated himself and notified her that appellant was being held at the police station. Detective Fourtney also located a deputy juvenile officer to read appellant his rights upon the arrival of his mother. Appellant's mother immediately contacted two attorneys. Appellant was informed of his *Miranda* rights and arrested. Appellant did not sign a waiver of his rights.

Appellant first contends that the trial court should have suppressed the statements he made to the police on April 18, 1996, because he was in custody and not advised of his rights under *Miranda v. Arizona,* in violation of his right against self-incrimination as guaranteed by the Fifth and Fourteenth Amendments to the

1. Appellant denies having told Detective Fourtney that he held Michael to his chest for five minutes. He also denies having told Detective Fourtney that he lay on Michael when he got off the bed.

United States Constitution and article 1, section 19 of the Missouri Constitution.

■ The privilege against self-incrimination includes the requirement that the police warn those taken into custody that they have the right to remain silent. *State v. Mahan*, 971 S.W.2d 307, 314 (Mo. banc 1998). "Custodial interrogation" occurs either when a suspect is formally arrested or under any other circumstances where the suspect is deprived of his freedom of action in any significant way. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "Custodial interrogation" means "questioning initiated by law enforcement officers." *Id*. In deciding whether a suspect is "in custody" at a particular time, courts examine the extent of the restraints placed on the suspect during the interrogation in light of whether a reasonable person in the suspect's position would have understood the situation to be one of custody. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Custody is determined by an examination of the totality of the circumstances. Missouri courts analyze issues regarding the privilege against self-incrimination claimed under the Missouri Constitution in a manner consistent with analysis of those arising under the federal constitution. *State ex rel. Munn v. McKelvey*, 733 S.W.2d 765, 767 (Mo. banc 1987).

■ Under Missouri law, the standard of review requires the reviewing court to defer to the trial court's factual findings and credibility determinations, but to examine questions of law *de novo*. *State v. Rousan*, 961 S.W.2d at 845. Factual issues on motions to suppress are mixed questions of law and fact. *Cf. State v. Higgins*, 592 S.W.2d 151, 157–58 (Mo. banc 1979); *State v. Rodgers*, 963 S.W.2d 725 (Mo.App. 1998). The question of whether a suspect is in custody in the context of federal habeas corpus review likewise "presents a mixed question of law and fact qualifying for independent review." *Thompson v. Keohane*, 516 U.S.

99, 102, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). An "issue of fact" is one of "primary, or historical facts: facts in the sense of a recital of external events and the credibility of their narrators." *Id*. at 110, 116 S.Ct. 457. As stated in *Thompson*, the "trial court's superior capacity to resolve credibility issues is not dispositive of the 'in custody' inquiry." *Id*. at 111, 113, 116 S.Ct. 457.

■ In 1990, the United States Court of Appeals for the Eighth Circuit undertook an extensive analysis of the question of custody. The court noted that precedent recognizes that an accused's freedom to leave the scene and the purpose, place, and length of an interrogation are factors to be considered in making a determination of custody. *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990). Those factors alone, however, are not determinative. *Id*. Other indicia of custody include:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere was police dominated; or,

(6) whether the suspect was placed under arrest at the termination of questioning.

*Id*. at 1349. This list is not exhaustive. *See Maine v. Thibodeau*, 475 U.S. 1144, 1146, 106 S.Ct. 1799, 90 L.Ed.2d 343 (1986). In examining the totality of the

circumstances, courts may also consider an individual's personal background, experience, familiarity with police questioning, maturity, education, and intelligence. *United States v. Zahrey*, 963 F.Supp. 1273, 1278 (E.D.N.Y.1997).

Although determining custody is not limited to applying the factors listed above, their presence and absence guide courts in assessing the totality of the circumstances surrounding interrogations. *Griffin*, 922 F.2d at 1349. With regard to the first three *Griffin* factors, the affirmative presence of one or more of them during questioning "would tend to mitigate the existence of custody at the time of questioning." *Id.* The affirmative presence of the last three *Griffin* factors would "tend to aggravate the existence of custody." *Id.* It is not necessary that all of the foregoing indicia be present to find custody. "A particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors." *Id.*

The most "obvious and effective means by which the police can demonstrate that a suspect has not been taken into custody" is for the police to inform the individual that he or she is not under arrest and that the individual can terminate the interview at will. *Griffin*, 922 F.2d at 1349, (citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). "The absence of police advisement that . . . the suspect is at liberty to decline to answer questions has been identified as an important indicium of the existence of a custodial setting." *Id.* at 1350. Where law enforcement officers have issued such an advisement, custody has frequently been found not to exist. *Id.*

In this case, the police did not inform appellant that he was not under arrest, nor did they tell him that he could terminate the interview at will. On the morning of April 18, 1996, after directing the assistant principal to remove appellant from class, Detective Fourtney "requested" that appellant and his sister accompany him to the police station. No one told appellant that he could refuse to go with Detective Fourtney. Despite the fact that Detective Fourtney requested, rather than ordered, appellant and Nacol to accompany him, the assistant principal testified that there was no question in his mind that appellant was going with the police. Law enforcement officers did not inform appellant that he was free to go, either before or after they transported him to the police station. The only time that any police officer directly addressed appellant in regard to his right to leave was when the officer arrested him. These facts tend to support the existence of custody.

■ Restraint on a suspect's freedom of movement during questioning bears on whether a court will find that a suspect was in custody. *Id.* "Circumstances of custody are frequently obviated where a suspect's freedom of action is not curtailed during questioning." *Id.* Suspects are often escorted or chaperoned during questioning for reasons unrelated to custody, but "the relevant inquiry is the effect on the suspect." *Id.* . "The likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials" is associated with the restraints of a formal arrest and tends to support the existence of custody. *Id.* at 1350–51.

In this case, appellant was under police supervision from the time Detective Fourtney removed appellant from school. Appellant was placed in a room by himself and permitted to use the bathroom, but only when accompanied by a police escort. Appellant was questioned in a room by himself. Once questioning began, appellant lacked control over the interview process. There was a break in questioning only when the detectives left to confirm appellant's story, and, as discussed below, appellant reasonably believed that he could not leave the room. These facts tend to support the existence of custody.

■ The method used to summon the individual is another factor courts consider in determining whether a suspect is "in custody." This inquiry often requires ascertainment of whether the individual initiated contact with the authorities or merely acquiesced to official requests to respond to questions. *Id.* at 1351. Courts have often found that an individual who initiates contact with the police or voluntarily arranges for questioning is not in custody. *Id.* "Conversely, when the confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement officers, rather than the suspect, custody is more likely to exist." *Id.* Mere acquiescence to an official's request to answer questions does not indicate that an individual voluntarily is talking with police and not in custody. *See United States v. Chamberlain,* 163 F.3d 499, 504 (8th Cir.1998) (holding inmate who appeared for interview at request of corrections official did not do so voluntarily because he reasonably could have believed that if he did not answer questions, he would have been in violation of prison rules).

In this case, appellant did not initiate contact with the police. On April 18, 1996, three detectives went to appellant's school and asked the assistant principal to remove appellant and his sister from class. The assistant principal escorted appellant to Detective Fourtney, and the assistant principal allowed the detectives to remove appellant from the school. The detectives informed appellant that they were investigating Michael's death and wanted to talk to him and to his sister. Appellant and his sister complied with the detectives' request to accompany them to the police station. The interview, therefore, was initiated by police detectives, whom appellant reasonably considered to be authority figures. Appellant, therefore, clearly did not initiate contact with the police; he merely acquiesced to an official request.

■ Courts also consider whether an individual was subjected to a police-dominated atmosphere when determining whether an individual is in custody. Questioning that occurs in an atmosphere dominated by the police "is more likely to be viewed as custodial than [questioning] which does not." *Griffin,* 922 F.2d at 1352. In determining whether the questioning is police-dominated, courts consider, among other factors, the length of the interview. There is no predetermined appropriate or inappropriate length of interrogation. *Rousan,* 961 S.W.2d at 846. The length is significant only in assessing the overall setting and atmosphere in which questioning is taking place. Courts also consider the place of an interview, as well as "whether the police assume control of the [ ] site and 'dictate the course of conduct followed by the [person being questioned]' or other persons present at the scene." *Id.* "Where the conduct of the police leads a suspect to believe that the police have taken control of the scene," a court is more likely to recognize the existence of custody. *Griffin,* 922 F.2d at 1352. In *Griffin,* the Eighth Circuit noted as an example of police domination "the removal of the suspect from the presence of family, friends, or colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements." *Id.* The court explained that law enforcement officers can assert their domination over an interrogation site by "removing a suspect from the presence of third persons who could lend moral support." *Id.*

Although the length of the questioning of appellant was short, and there is no evidence that the police engaged in coercive actions or practices, such as "strong arm" tactics, in this case, the atmosphere in which the questioning took place was police-dominated. Before questioning appellant, the detectives separated appellant from familiar surroundings by removing him from school and transporting him in isolation to the police station. Detective Fourtney testified that part of the reason that three detectives went to the school to

retrieve two children was to ensure that the appellant and his sister would be kept separate. Upon arriving at the station, Detectives Fourtney and Berra placed appellant by himself in an interview room. Although appellant was not locked in and, as the state points out, was not in a cell, appellant testified that he did not know that he could leave the room. The police escorted appellant to the bathroom when he requested to use it. Because Detective Fourtney waited to question appellant until all of the household members present during the night of Michael's death arrived at the station, appellant was either isolated or in the presence of one or more police officers for approximately three hours after being removed from school by Detective Fourtney. Appellant concedes that he did not request to see anyone from outside of the police department, but Detective Fourtney testified that had an attorney for appellant arrived prior to appellant's making any incriminating statements, the police would not have allowed the attorney access to appellant. These facts indicate that appellant lacked control over his course of conduct once Detective Fourtney removed appellant from school and tend to aggravate the existence of custody.

Another indicium of custody is whether an individual was placed under arrest at the termination of questioning. *Griffin*, 922 F.2d at 1349. In this case, the police arrested appellant after they finished questioning him. This tends to aggravate the existence of custody.

When assessing the totality of the circumstances, a court may consider an individual's personal background, experience, familiarity with police questioning, maturity, education, and intelligence to determine the totality of the circumstances. *Zahrey*, 963 F.Supp. at 1278. In this case, appellant was a sixteen-year-old with a below average I.Q. of 78. Appellant's special education teacher testified that appellant was learning disabled and functioned at a fourth-grade level at the time of Michael's death. Appellant's teacher also testified

that appellant had some comprehension difficulties when speakers used "intellectual" words or appellant had to think about what a speaker was saying. There is no evidence that appellant was familiar with police questioning, apart from his experiences associated with Michael's death. These facts strongly support appellant's assertion that his freedom of action was curtailed to a degree associated with formal arrest and that a reasonable person in his position would have understood the situation to be one of custody. *See Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138.

■ In light of the totality of the circumstances, appellant was in custody when the police questioned him on April 18, 1996. Appellant did not voluntarily talk with the police, but, rather, was summoned by law enforcement officers, removed from school, isolated from his friends and family, and questioned by two detectives without receiving a *Miranda* warning. There is no evidence that appellant, a sixteen-year-old functioning at a fourth-grade level, who was unfamiliar with police procedures, understood that he could refuse to answer the officers' questions, or simply leave. None of the authority figures with whom appellant had contact throughout the day informed him that he was free to leave. After the police questioned appellant, they placed him under arrest. Additionally, appellant never waived his *Miranda* rights. A reasonable person in appellant's situation would have thought himself to be in custody. An assessment of the totality of the circumstances demonstrates that appellant was in custody and should have been afforded his rights under the Fifth and Fourteenth Amendments.

The state contends that a reasonable person in appellant's position would have known that he was not in custody because appellant talked to the police on March 15th about Michael's death, appellant was not placed in a cell, and appellant was permitted to use the bathroom. The details emphasized by the state, although

valid, do not alter the determination that appellant was in custody. The fact that the police previously questioned appellant does not lead to a conclusion that appellant was informed or aware that the questioning was voluntary on April 18, 1996, or that he was free to leave that day. Similarly, while the location of questioning bears on the issue of whether or not one is in custody, "the setting of an interrogation is not so important to the inquiry [of whether an individual is in custody] as the question of police domination of that setting." *Griffin*, 922 F.2d at 1354–55. Finally, as noted above, the fact that appellant was permitted to use the bathroom does not negate this Court's finding that appellant was in a police-dominated atmosphere.

The state relies on *State v. Feltrop*, 803 S.W.2d 1, 13 (Mo. banc 1991), to support its argument that appellant was not in custody. Feltrop, however, willingly followed the police to the station in his own vehicle and was at liberty to leave at any time. He was not restrained in any way. During the investigatory interview, detectives permitted Feltrop to take unsupervised breaks and to leave the room in which the questioning was taking place. Most significantly, Feltrop was advised of his *Miranda* rights and voluntarily waived those rights. Feltrop fully disclosed the murder after he waived his rights and assumed that he was free to go even after he confessed; he asked to drive his own car to the discovery site of his victim's body parts so that he could return home in time to go to work. *Id.*

Unlike Feltrop, appellant did not willingly follow Detectives Fourtney and Berra to the police station when he learned that the police wanted to talk to him. Appellant merely acquiesced to an official request for questioning. Detectives Fourtney and Berra transported appellant to the police station, and the facts do not indicate that appellant's acquiescence constituted a voluntary action. There is no evidence that the police engaged in coercive actions or tactics. A reasonable person with appellant's limited I.Q. and experience, however, reasonably would have believed that he could not refuse to talk with the detectives, leave the interview room, or terminate the interview. Finally, appellant did not waive his *Miranda* rights, nor did he believe that he was free to depart from the station after he made the statements. The record in this case, therefore, does not indicate that appellant voluntarily talked with the police or voluntarily remained at the police station prior to his arrest. The state's reliance on *State v. Feltrop* is misplaced.

In addition to his claim that the police violated his Fifth Amendment rights, appellant asserts that the trial court erred in failing to grant his motion to suppress because appellant's person was unlawfully seized. As a consequence, appellant contends, the admission into evidence of the fruits of the unlawful seizure violated his rights as protected by the Fourth and Fourteenth Amendments to the United States Constitution and article 1, section 15 of the Missouri Constitution.

■■■ The Fourth Amendment, applicable to the states through the Fourteenth Amendment, bars the admission of a statement that is the product of an illegal arrest or seizure and guarantees the right of individuals "to be secure in their persons . . . against unreasonable searches and seizures. . . ." *Dunaway v. New York*, 442 U.S. 200, 219, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); U.S. Const. amends. IV, XIV. The primary purpose of the Fourth Amendment protections is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officials. *State v. Parish*, 937 S.W.2d 745, 747 (Mo.App. 1997). "The Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether those intrusions be termed 'arrests' or 'investigatory detentions.'" *Dunaway*, 442 U.S. at 214–15, 99 S.Ct. 2248.

For Fourth Amendment purposes, a "seizure" occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Not all "personal intercourse" between the police and individuals involves "seizures" of persons. *Id.* at 19 n. 16, 88 S.Ct. 1868. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Id.* In other words, a seizure occurs "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988). Generally, "every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Michigan v. Summers*, 452 U.S. 692, 699, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).[2] Analysis of search and seizure issues under the Missouri constitution is consistent with analysis of those arising under the Fourth Amendment to the United States Constitution. *State v. Rushing*, 935 S.W.2d 30, 34 (Mo.banc 1996).

The state does not contend that it had probable cause to seize appellant. The state argues only that the police did not violate appellant's Fourth Amendment rights because appellant voluntarily accompanied police on April 18, 1996. The state is incorrect. As noted, under the Fourth Amendment a person is seized and does not voluntarily accompany the police to the police station "if a reasonable person would have believed that he was not

free to leave." *Chesternut*, 486 U.S. at 573, 108 S.Ct. 1975.

As discussed in relation to appellant's Fifth Amendment claim, appellant reasonably believed that he was not at liberty to leave. Appellant was summoned by law enforcement officers and removed from school. The police had control of his movements, and appellant merely acquiesced to an official request to accompany Detective Fourtney to the police station. The police isolated appellant from his friends and family and questioned him without giving him a *Miranda* warning. At the time of the incident, appellant was a sixteen-year-old functioning at a fourth-grade level. He was unfamiliar with police procedures. There is no evidence that he understood that he could refuse to answer the officers' questions or simply leave. None of the authority figures with whom appellant had contact throughout the day informed him that he was free to leave. While the police did not formally arrest appellant until after he incriminated himself, the police seized him for Fourth Amendment purposes prior to his making any statement. This Court accordingly holds that the police violated appellant's rights as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and article 1, section 15 of the Missouri Constitution by illegally seizing and detaining appellant without probable cause. Because the statements made by appellant on April 18, 1996, were a direct result of an illegal seizure, the trial court should have excluded and suppressed them.

In conclusion, in view of the totality of the circumstances, appellant was in custody under the Fifth and Fourteenth

---

**2.** The police may not seize individuals without probable cause and question them "in the hope that something might turn up." *Dunaway*, 442 U.S. at 216, 99 S.Ct. 2248. There is, however, a special category of Fourth Amendment seizures "so substantially less intrusive than arrests that the general rule requiring probable cause to make Fourth Amendment 'seizures' reasonable could be replaced with a

balancing test." *Id.* at 210, 99 S.Ct. 2248. This narrowly defined category constitutes situations where the public interest in preventing criminal activity outweighs an individual's right to be free from arbitrary interference by law officers. *Id.* The state in this case does not contend that the actions of the police came within this category.

Amendments to the United States Constitution and article 1, section 15 of the Missouri Constitution. He was, in addition, improperly seized in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and article 1, section 19 of the Missouri Constitution. As a consequence, the trial court erred in failing to sustain appellant's motion to suppress the statements he made on April 18, 1996. Because this Court holds that the statements should have been suppressed on constitutional grounds, it is unnecessary to address whether the statements should have been suppressed pursuant to sections 211.059 and 211.061, RSMo 1994.

Reversed and remanded for proceedings consistent with this opinion.

All Concur.