

# Missouri Court of Appeals
## Southern District
### Division Two

STATE OF MISSOURI, )
)
              Respondent, )
)
    vs. )      No. SD34271
)      Filed: December 15, 2016
JASON RUBIN BRUCE, )
)
              Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF PHELPS COUNTY

Honorable William E. Hickle, Judge

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS

Jason Rubin Bruce ("Bruce"), appeals the judgment of the trial court following his convictions for the unclassified felony of first-degree rape, two unclassified felonies of first-degree sodomy, the class B felony of first-degree burglary, and the class C felony of felonious restraint. Bruce challenges the judgment of the trial court in two points on appeal. Finding no merit to Bruce's first point, but finding merit to Bruce's second point, we modify and affirm the judgment of the trial court.

## Factual and Procedural Background

Bruce does not challenge the sufficiency of the evidence to support his convictions and we recite only those facts necessary to review his points on appeal. We view the evidence in the light most favorable to the judgment, accepting as true all facts and inferences favorable to the judgment, and disregarding evidence and inferences to the contrary. *State v. Burks*, 373 S.W.3d 1, 4 (Mo.App. S.D. 2012). The evidence adduced at trial is recited in accordance with these principles.

On November 7, 2014, Bruce surreptitiously entered Victim's residence while Victim was taking a shower. Bruce tied up Victim with shoestrings, then sexually assaulted her. Bruce untied Victim and forced her to sign-off of a computer video-chat that, unbeknownst to Bruce, had been running with Victim's boyfriend. After Victim complied, Bruce tied her up again, put her in a closet, and ransacked Victim's home. Victim asked what Bruce was looking for. When Bruce said he was looking for Victim's car keys, Victim offered to help find them. Bruce untied Victim and they both unsuccessfully searched for the keys. Bruce again tied Victim up, shoving clothing in her mouth so she could not speak, and shut her in a closet and then a bathroom. Eventually, Bruce untied Victim. He said that if she told anyone what he had done, he would kill her. Then Bruce left.

The authorities were notified, and Victim identified Bruce as her attacker. Sergeant Frank Hawkins ("Sgt. Hawkins") responded to the scene. After speaking with Victim, Sgt. Hawkins went across the street to Bruce's home, where he found Bruce sitting on the hood of his car. Bruce claimed he did not know Victim, but said he would be willing to talk to a detective at the police station, and that he would drive himself there.

At the police station, Detective Adam Meyer ("Detective Meyer") met Bruce when he arrived. Detective Meyer introduced himself, and asked if Bruce would accompany him back to an interview room, which Bruce agreed to do. Bruce initially denied that he had ever spoken with Victim, and also denied having ever engaged in sexual conduct with Victim.

After Detective Meyer asked Bruce about whether his DNA or hair might be at Victim's home, Bruce admitted to meeting Victim. He suggested they had met when Victim was walking her dog, and that the two had engaged in "some type of sexual relations" in Victim's apartment. Detective Meyer asked Bruce why he had not been truthful from the beginning, and Bruce said he did not want his wife to find out what he had done with Victim. Detective Meyer indicated that he would not tell Bruce's wife. Bruce then gave a more detailed account of, by Bruce's account, consensual sexual acts he and Victim engaged in at Victim's apartment. These acts, Bruce alleged, did not include vaginal sex or oral sex.

Detective Meyer and Bruce took a break so that Detective Meyer could get some water and Bruce could smoke a cigarette. Detective Meyer went outside with Bruce while he smoked, and then the two returned to the interview room. Bruce told Detective Meyer that he wanted to leave. Detective Meyer told Bruce that he could not leave, placed him under arrest, and read him his *Miranda*[1] rights. Bruce said he understood his rights, and agreed to speak further with Detective Meyer. He indicated that he was at Victim's house in the late evening a few days before the assault, but denied going to Victim's house on the day of the assault.

Forensic evidence showed that Victim's DNA was found on Bruce's boxer shorts the day he was interviewed, and that Bruce's DNA was on Victim's body the day of the assault.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

After the close of evidence, instructions, and argument by counsel, the jury found Bruce guilty of first-degree rape, two counts of first-degree sodomy, first-degree burglary, and felonious restraint. Having found Bruce to be a prior offender, the trial court sentenced Bruce to three life sentences on each of the rape and sodomy counts, fifteen years on the burglary count, and seven years on the felonious restraint count, with all sentences to run consecutively. This appeal followed.

In two counts on appeal, Bruce asserts:

1.  The trial court erred in admitting the statements Bruce made during police interrogation because they arose out of a custodial interrogation without a ***Miranda*** warning; and

2.  The written judgment is in error in that it states that Bruce is sentenced to ninety-nine years in prison for each of Counts I, II, and III because this conflicts with the trial court's oral pronouncement in court that it was sentencing Bruce to life in prison for each of those counts.

**Principles of Review**

A trial court's ruling on a motion to suppress will be reversed only if it is clearly erroneous. The trial court's ruling will be deemed clearly erroneous if, after review of the entire record, this Court is left with the definite and firm impression that a mistake has been made. This Court defers to the trial court's factual findings and credibility determinations and considers all evidence and reasonable inferences in the light most favorable to the trial court's ruling. Whether conduct violates the Fourth or Fifth Amendments is a question of law that this Court reviews *de novo*.

*State v. Lammers*, 479 S.W.3d 624, 630 (Mo. banc 2016) (internal quotations and citations omitted). The entire record, in the context of the review of a court's suppression ruling, includes the evidence at both the suppression hearing and at trial. *State v. Gaw*, 285 S.W.3d 318, 319 (Mo. banc 2009).

4

**Analysis**

*Point I: Bruce Was Not in Custody*

In his first point, Bruce claims the trial court erred in admitting statements Bruce made during his police interrogation because they were obtained in a custodial interrogation without a *Miranda* warning.

A criminal suspect is entitled to *Miranda* warnings to protect his Fifth Amendment right against self-incrimination, but only when the suspect is subjected to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000). "A custodial interrogation occurs only when the suspect is formally arrested or is subject to arrest-like restraints." *State v. Glass*, 136 S.W.3d 496, 508–09 (Mo. banc 2004). "In Missouri, 'custodial interrogation' is defined as questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 511. "In the absence of arrest or restraint of freedom of movement, questioning that takes place in a coercive environment does not require *Miranda* warnings." *Id.* (internal quotation and citation omitted).

"Custody is determined by an examination of the totality of the circumstances." *Werner*, 9 S.W.3d at 595. The Supreme Court of Missouri noted, "an accused's freedom to leave the scene and the purpose, place, and length of an interrogation are factors to be considered in making a determination of custody." *Id.* (quoting *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990)). "In examining the totality of the circumstances, courts may also consider an individual's personal background, experience, familiarity with police questioning, maturity, education, and intelligence." *Id.* at 595–96. The supreme court went on to enumerate six additional factors for courts to take into consideration when determining custody:

5

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere was police dominated; or

(6) whether the suspect was placed under arrest at the termination of questioning.

*Werner*, 9 S.W.3d at 595 (quoting *Griffin*, 922 F.2d at 1349). The presence and absence of these factors, while not exhaustive, guide courts in accessing the totality of the circumstances. *Werner*, 9 S.W.3d at 596-97. Indeed, our courts have held that "it is not necessary or even always appropriate to determine custody by weighing the presence or absence of the six *Griffin*/*Werner* factors in each case. Rather, we look at the totality of the circumstances." *State v. Schneider*, 483 S.W.3d 495, 501 (Mo.App. E.D. 2016) (internal quotation and citation omitted). As our supreme court recently indicated, "[t]he simple fact that investigative questioning takes place in a potentially coercive environment does not require *Miranda* warnings." *Lammers*, 479 S.W.3d at 632 (internal quotation and citation omitted).

This Court's inquiry into custody must be resolved based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *State v. Hill*, 247 S.W.3d 34, 46 (Mo.App. E.D. 2008) (internal quotations and citations omitted). "The objective, reasonable person test is appropriate because it does not place on the police the burden of anticipating the frailties or idiosyncrasies of every person whom they question." *Id.* at 47 (internal quotations and citations omitted). With these

6

prescriptions in mind, the ultimate question before us is whether a reasonable person would have felt at liberty to terminate or leave the interrogation. *Id.* at 48.

Here, Bruce argues he was subject to custodial interrogation because of the following facts: the interrogation room was difficult to get to; Officer Meyer walked with Bruce when Bruce went to smoke a cigarette; Bruce acquiesced to a law enforcement request that he talk to detectives at the police station; Officer Meyer told Bruce that he knew Bruce had some sort of sexual contact with Victim; the interrogation room was small and of spare décor; and Bruce was arrested at the termination of the meeting.

After reviewing the entire record, this Court is not left with the definite and firm impression that a mistake has been made. Bruce voluntarily agreed to meet detectives at the police station, and drove there by himself. Bruce was questioned in an ordinary interview room, and was not physically restrained, or told he could not leave. When Bruce wanted to smoke a cigarette, he was allowed to do so. While Officer Meyer told Bruce that he knew Bruce had some sort of sexual contact with Victim, it does not follow that a reasonable person would have then deduced that he was not free to leave. While Bruce was eventually arrested, that act does not impact how a reasonable person would have viewed his opportunity to leave or terminate the interview beforehand.

In *State v. Sardeson*, we found that the suspect was not in custody during his interrogation where, like here, the suspect voluntarily went to the police station for questioning, suspect was not physically restrained, police used deceptive strategies and psychological ploys against the suspect, and suspect was arrested after the interview. 220 S.W.3d 458, 468 (Mo.App. S.D. 2007).

The facts of which Bruce complains are largely incident to almost any serious police investigation. As our supreme court has indicated, "[t]he simple fact that investigative questioning

7

takes place in a potentially coercive environment does not require *Miranda* warnings." *Lammers*, 479 S.W.3d at 632 (internal quotation and citation omitted).

The trial court did not err in admitting Bruce's statements made during his police interview. Point I is denied.

### *Point II:  Error in Written Judgment*

In his second point, Bruce argues that the trial court erred in issuing a written judgment stating that Bruce had been sentenced to ninety-nine years in prison for Counts I, II, and III because this conflicts with the trial court's oral pronouncement at sentencing that it was sentencing Bruce to life in prison for each of those counts.

"The failure to accurately memorialize the trial court's judgment as announced in open court is a clerical error." *State v. Hays*, 396 S.W.3d 385, 387 (Mo.App. W.D. 2013) (internal quotation and citation omitted).  "Where there is a material variance between the written judgment and the oral pronouncement, the oral pronouncement is controlling." *Lucas v. State*, 451 S.W.3d 336, 343 (Mo.App. E.D. 2014).

At the sentencing hearing, the court pronounced it was sentencing Bruce to life sentences on each of Counts I, II, and III.  The written judgment, however, states Bruce was sentenced to 99-year sentences on each of Counts I, II, and III.

We reverse the judgment as to the written sentence of Bruce and remand with instructions to the trial court to correct the written sentence consistent with the trial court's oral pronouncement at sentencing.  The judgment is affirmed in all other respects.

WILLIAM W. FRANCIS, JR., J. – OPINION AUTHOR

GARY W. LYNCH, P.J. - CONCURS

DANIEL E. SCOTT, J. - CONCURS