James M. Dowd, Chief Judge
Justin L. McElroy was found guilty following a bench trial in the Circuit Court of Scotland County of one count of the class C felony of possession of a controlled substance, namely methamphetamine. McElroy was sentenced to five years in prison. On appeal, McElroy claims that the trial court clearly erred when it denied his motion to suppress and admitted into evidence a vial of methamphetamine powder found pursuant to a warrantless search of his person, and statements he made without first receiving the Miranda warnings. We disagree and affirm.
Factual and Procedural Background
Kevin Goosey was sentenced in an unrelated case to probation, one of the conditions of which was that his residence was to remain open to a warrantless search by law enforcement officers at any time to verify that he was complying with other conditions of his probation. So, on the evening of May 25, 2014, City of Memphis Police Officer Jason Ketchum enlisted the assistance of Missouri State Highway Patrol Sergeant Michael Kaugh and Trooper Brett Tappendorf to conduct a bond compliance search of Goosey's residence. None of the law enforcement officers had reason to know that McElroy would be at Goosey's residence.
Once at the residence, the officers first made contact at the front door with James Wheeler, and when they identified themselves as police officers he responded in alarm with an expletive. Moments later, Goosey appeared at the door and allowed the officers to perform their bond compliance search of his residence. Once inside, the officers conversed briefly with Goosey and Wheeler before asking whether there was anyone else in the residence. Goosey responded that McElroy was also present. The officers moved from the front room of the house, a living room, back through the kitchen and toward the rear bedroom, where they found McElroy seated at a table.
*632 Officer Ketchum shook hands with McElroy and explained the nature of the search they were conducting. While speaking with McElroy, Officer Ketchum observed Goosey sit down at the table, lean toward a nearby bed, and begin to make furtive movements. Officer Ketchum was concerned that Goosey was grabbing for something that could harm the officers and ordered Goosey to stand up. Goosey complied. As Officer Ketchum approached Goosey, he observed partially beneath the bed and the table a blue pen stem and a piece of burnt foil. Officer Ketchum identified these items as methamphetamine-related drug paraphernalia.
At that point, Officer Ketchum requested the other two officers to handcuff Goosey, Wheeler, and McElroy to prevent the alteration or destruction of evidence and to limit Goosey, Wheeler, and McElroy's movement in light of the tight quarters inside the residence and the readily available weapons in the house. Officer Ketchum had observed a "large amount of clutter str[e]wn completely through[out] the residence," including screwdrivers, handsaws, large glass bottles, and knives "laying all over the place" in the kitchen. Trooper Tappendorf also had noted that "[i]t was a very cluttered house, lots of places that anything could be stored that could be used as a weapon."
Trooper Tappendorf handcuffed McElroy. He then conducted an over-the-clothing patdown of McElroy's person, observing an unidentified "bulge" in McElroy's right front pocket. Trooper Tappendorf asked McElroy what it was and McElroy said it was a pocketknife. Trooper Tappendorf then removed the object from McElroy's pocket. Trooper Tappendorf discovered that it was not a pocketknife but a small, clear vial containing a white powdery crystal substance that was later determined by the Missouri State Highway Patrol Crime Lab to be methamphetamine.
McElroy was charged with one count of the class C felony of possession of a controlled substance. He filed a motion to suppress evidence of the vial of methamphetamine powder, including his statement to Trooper Tappendorf that he had a pocketknife in his pocket. The trial court denied the motion and McElroy's motion to reconsider and found him guilty of the charged offense. This appeal follows.
Standard of Review
We will reverse the trial court's denial of a motion to suppress only if the trial court's ruling was clearly erroneous. State v. Esmerovic , 544 S.W.3d 695, 2018 WL 1720917, *2 (Mo.App.E.D. 2018) (citing State v. Cook , 273 S.W.3d 562, 567 (Mo.App.E.D. 2008) ). The trial court's ruling is clearly erroneous if we are left with a definite and firm belief a mistake was made. Id. We will not reverse the trial court's decision if, in light of the record as a whole, the ruling was plausible. Id. (citing State v. Foster , 392 S.W.3d 576, 578 (Mo.App.S.D. 2013) ). In reviewing the trial court's ruling on a motion to suppress, the facts and any reasonable inferences arising therefrom are to be viewed in a light most favorable to the ruling of the trial court. Id. (citing State v. Carter , 955 S.W.2d 548, 560 (Mo.banc 1997) ). However, whether the Fourth Amendment was ultimately violated is a question of law, which we review de novo. Id. (citing State v. Swartz, 517 S.W.3d 40, 48 (Mo.App.W.D. 2017) ). Consequently, we review de novo legal determinations of reasonable suspicion and probable cause. State v. Carrawell, 481 S.W.3d 833, 837 (Mo.banc 2016).
Discussion
In his three points on appeal, McElroy attacks the constitutionality of the police procedures pursuant to which officers seized from his pocket the vial containing *633 methamphetamine powder. He claims the officers violated his Fourth Amendment rights[1] (1) by conducting the warrantless patdown search of his person that turned up the vial, because before he misrepresented that he had a pocketknife in his pocket, they did not have a reasonable, particularized suspicion that he was armed and presently dangerous, and (2) by removing the vial from his pocket, because it was not-before being removed-immediately identifiable as contraband or other evidence of a crime. He further claims that the officers violated his Fifth Amendment right against self-incrimination[2] by asking him what was in his pocket without first advising him of his right to remain silent under Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We find McElroy's contentions to be without merit.
First, we find that the officers were permitted to conduct their warrantless patdown search of McElroy's person. The United States Supreme Court stated in Terry v. Ohio, 392 U.S. 1, 24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threats of physical harm." Consequently, the Court reasoned, "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Id. at 27, 88 S.Ct. 1868. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S.Ct. 1868. "And in making that assessment it is imperative that the facts be judged against an objective standard." Id.
Here, even before McElroy misrepresented that he had a pocketknife in his pocket, the officers could reasonably have suspected, based on specific and articulable facts, that he was presently armed and dangerous. The officers observed numerous sharp objects lying about the kitchen, including screwdrivers, handsaws, and *634 knives, and did not find McElroy in the rear bedroom of the house until a minute or two after they entered the house; declared that they were police officers; and prompted an alarmed response from one of McElroy's companions. In light of these facts, it would at least have been reasonable for the officers to fear-upon discovering McElroy only after enough time had passed for him to prepare for their entrance into the bedroom-that he had armed himself. Therefore, the officers did not violate McElroy's Fourth Amendment rights by conducting a warrantless patdown search of his person shortly after locating him in the rear bedroom.
Turning to McElroy's second Fourth Amendment claim, we find that the officers were permitted to remove the vial from McElroy's pocket. Whether or not the vial's illicit character was immediately identifiable while still in McElroy's pocket, once he said he had a pocketknife in his pocket, the officers clearly had a reasonable, particularized suspicion that McElroy was presently armed and dangerous, and thus Terry absolutely justified the officers' search of his pocket to remove the purported weapon.
Finally, we find that the officers were permitted under the Fifth Amendment and Miranda to ask McElroy what was in his pocket without first advising him of his right to remain silent. The public-safety exception to Miranda that is recognized by this Court, see State v. Jackson , 756 S.W.2d 620, 621 (Mo.App.E.D. 1988) (citing New York v. Quarles, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) ) (holding that for their own safety, police officers could-prior to administering Miranda warnings-ask an allegedly armed rape suspect where his gun was), applies here.
After observing knives, handsaws, and screwdrivers lying about the kitchen, conducting a patdown of McElroy, and feeling a bulge in his right front pocket, Trooper Tappendorf could reasonably have feared that McElroy possessed a weapon and that, though he had been handcuffed, McElroy remained armed and presently dangerous. Moreover, the only confession McElroy claims was coerced here is that he had a pocketknife in his pocket-not a crime or any suggestion of one-making this case unlike those in which judges have expressed concern about whether the public-safety exception might swallow Miranda's protective rules. See, e.g., Quarles, 467 U.S. at 674, 685, 690, 104 S.Ct. 2626 (Marshall, J., dissenting) (asserting that where without providing the Miranda warnings the police interrogated a man suspected of illegally possessing a firearm and obtained his confession of the gun's location, the majority should have found the statement was a coerced testimonial self-incrimination that under the Fifth Amendment should have been excluded).
McElroy's points on appeal are denied.
Conclusion
For the reasons stated above, we affirm the judgment of the trial court.
Lawrence E. Mooney, J., Robert M. Clayton III, J., concur.

The Fourth Amendment of the United States Constitution, incorporated against the States by the Fourteenth Amendment, guarantees people the right to be free from unreasonable searches and seizures, Missouri likewise prohibits unreasonable searches and seizures, under Article I, Section 15 of the Missouri Constitution, which is coextensive with the protection guaranteed by the Fourth Amendment. See Carrawell, 481 S.W.3d at 837 n.3 (noting that with regard to the protection against unreasonable searches and seizures, the same analysis applies to cases under the Missouri Constitution as under the United States Constitution).

The Fifth Amendment of the United States Constitution, also incorporated against the States by the Fourteenth Amendment, protects people from being compelled to incriminate themselves. Missouri defends the right against self-incrimination under Article I, Section 19 of the Missouri Constitution, in another coextensive protection. See State v. Werner, 9 S.W.3d 590, 595 (Mo.banc 2000) ("Missouri courts analyze issues regarding the privilege against self-incrimination claimed under the Missouri Constitution in a manner consistent with analysis of those arising under the federal constitution.").