# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2888

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the |
| Randall Dewey Brave Heart, Jr., | * | District of South Dakota. |
| also known as Dewey Randall | * | |
| Brave Heart, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: May 11, 2004
Filed: February 4, 2005

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

During the course of a two-hour interrogation, Randall Dewey Brave Heart, Jr. (Brave Heart), confessed to the murder of his infant nephew. He was indicted for murder in the second degree under 18 U.S.C. §§ 1153 and 1111, and subsequently moved to suppress his confession. The district court granted the motion, finding first that Brave Heart was "in custody" during questioning but was not informed of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and, second, that coercive interview tactics and false promises overbore Brave Heart's will and rendered his confession involuntary. We reverse.

# I.

Brave Heart called 911 on January 7, 2003, and told the dispatcher that his ten-month-old nephew, Zane Bruguier, had stopped breathing. The dispatcher talked Brave Heart through the administration of CPR, but neither Brave Heart nor the paramedics could save the infant. Brave Heart, who had been babysitting Bruguier and his own two children, informed officers on the scene that Bruguier became unresponsive after Brave Heart's one-year-old son struck him in the head with a toy.

The following day, FBI Special Agent C. Andrew de la Rocha learned from a forensic pathologist that Bruguier had died due to bleeding on both sides of his brain caused by two areas of blunt force head trauma. These injuries were inconsistent with Brave Heart's proffered explanation of the cause of Bruguier's death. Because Brave Heart was the only adult present when Bruguier was injured, de la Rocha believed that Brave Heart had caused the infant's death and he wished to interview Brave Heart to determine how the injuries had occurred. De La Rocha discussed the best way to question Brave Heart with Cheyenne River Tribal Officer Larry LeBeau, and LeBeau ultimately placed a phone call to the Brave Heart residence.[1] Brave Heart drove to the police station with his wife and children later that afternoon.

De La Rocha and LeBeau first questioned Brave Heart's wife, while Brave Heart waited in the lobby with the couple's children. The questioning lasted around ninety minutes, following which Brave Heart's wife undertook care of the children. At approximately 5:40 p.m., Brave Heart was led to a conference room approximately thirty feet by forty feet, with two adjacently placed tables in the middle and two doors, each leading to interior hallways. Brave Heart sat at the head of one of the tables, with LeBeau and de la Rocha seated a few feet away on either side of the tables. One of the doors was behind Brave Heart and to his right, and it remained

---

[1]The record does not reveal to whom LeBeau spoke or the content of the conversation.

closed at all times. The second door, through which Brave Heart and the officers entered, was located behind de la Rocha, and was closed only during questioning.

De La Rocha introduced himself, thanked Brave Heart for coming, and stated that the officers had some questions about Bruguier's death. He then advised Brave Heart that he was not under arrest, that de la Rocha did not intend to arrest him, and, finally, that the interview was voluntary and that Brave Heart could leave through either door if he wished. Brave Heart remained and, during the first hour of questioning, recited a version of events essentially consistent with the one that he had provided the previous day.

De La Rocha and LeBeau took a break from questioning at approximately 6:40 p.m., informing Brave Heart that they needed to make some phone calls. They asked Brave Heart if he would like anything to drink, but he declined. The officers then left the conference room via the door behind de la Rocha, leaving it ajar. Brave Heart remained alone in the room until the officers returned about ten minutes later.

Upon re-entering the room, de la Rocha adopted a more accusatory tone, telling Brave Heart that "the evidence in the case clearly shows that you were directly responsible for the injuries suffered by [Bruguier] and that you were responsible for his death." De La Rocha then explained that he had just spoken with a forensic pathologist who had discovered two trauma areas on the infant's head instead of the one that Brave Heart claimed that his young son had inflicted.[2] De La Rocha suggested that he understood "the stress and pressure that [Brave Heart] was under… taking care of three small children" and indicated that he did not think it was fair that

---

[2]De La Rocha conceded that he attempted to give Brave Heart the impression that he had spoken with the pathologist during the ten-minute break even though the conversation actually had occurred earlier in the day.

Brave Heart's son would bear the burden of thinking that he was responsible for Bruguier's death.

Brave Heart became visibly upset during de la Rocha's comments, and began to cry. Upon de la Rocha's suggestion "that [Bruguier's] biological mother (Brave Heart's sister-in-law) shared some responsibility for what had happened," Brave Heart stated that he was the one who was responsible. De La Rocha mentioned the "burden" that Brave Heart must be carrying and stated that he "needed to know the truth," suggesting that doing so would make Brave Heart feel better. Brave Heart then admitted that he had struck Bruguier's head against a window frame when the child would not stop crying. When de la Rocha then pointed out that striking the window frame would explain only one of the infant's injuries, Brave Heart admitted that he had also "head-butted" Bruguier.

After discussing what Brave Heart meant by a "head-butt," de la Rocha requested that Brave Heart make a written or taped statement summarizing their discussion, suggesting that Brave Heart could express his sorrow in his own words on the tape. Brave Heart agreed. Near the beginning of the eleven-minute taped interview, de la Rocha asked Brave Heart if he and LeBeau had been polite and respectful during the questioning, and Brave Heart responded, "Yes." De La Rocha then asked if the officers made any threats or promises to Brave Heart, to which Brave Heart replied that they had not. De La Rocha next asked if the officers had forced Brave Heart to talk in any way, and Brave Heart responded, "No, I came in on my own free will." The following colloquy then occurred:

> De La Rocha: At the beginning of the interview, I advised you that you were not under arrest, and it was not the intention, nor was it my intention, to arrest you at the outset of the interview. Do you remember me telling you that?
> Brave Heart: Yes.

De La Rocha:   Do you remember me telling you that this interview is completely voluntary, and that if you didn't want to talk to us, you could've walked out either one of the doors if you wanted to?

Brave Heart:   Yes.

Brave Heart completed a tape-recorded confession at approximately 7:36 p.m., recounting how he had struck and then head-butted Bruguier. Upon completion of the tape, the officers again left the room, stating that they had to make more phone calls. It is undisputed that they did not inform Brave Heart of his <u>Miranda</u> rights before or during questioning, nor did they tell Brave Heart that he could leave after taping his statement. Brave Heart remained in the conference room while the officers called their superiors and, ultimately, an Assistant United States Attorney. Some twenty minutes after the interview ended, the officers informed Brave Heart that he was under arrest by tribal authorities, and around 9:00 p.m., placed him under federal arrest.

At the time of his confession, Brave Heart was twenty-four years old and had experienced only minor contacts with law enforcement, including some tribal arrests, a state conviction for driving without a license, and later-dismissed charges for eluding a police officer and underage alcohol possession. Brave Heart has an eleventh grade education, and, although he was unemployed at the time of Bruguier's death, has a limited employment history with a grocery store.

## II.

### A.

Law enforcement officials must administer <u>Miranda</u> warnings whenever they interrogate persons in their custody. <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir. 2002). A person is "in custody" when he is formally arrested or when his

freedom of movement is restrained to a degree equivalent with formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam); United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004). We review the district court's findings of historical fact for clear error and consider its conclusions regarding the question of custody de novo. United States v. LeBrun, 363 F.3d 715, 719 (8th Cir. 2004) (en banc), petition for cert. filed, 73 U.S.L.W. 3162 (July 8, 2004) (No. 04-322).

In order to determine whether a person is in custody, we look to the totality of the circumstances confronting the defendant at the time of questioning, id. at 720, and base our determination "on the objective circumstances of the interrogation" rather than "the subjective views harbored by either the interrogating officers or the person being questioned." Id. (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Thus, the "only relevant inquiry" is whether a reasonable person in Brave Heart's position would have felt at liberty to end the interrogation and leave. Czichray, 378 F.3d at 826; LeBrun, 363 F.3d at 720 (citations omitted).

The district court largely adopted the magistrate judge's findings, concluding that a reasonable person in Brave Heart's position would not have felt free to terminate the interview and leave. Citing the various indicia of custody that we identified in United States v. Griffin, 922 F.2d 1343, 1349-52 (8th Cir. 1990), the district court noted that although de la Rocha informed Brave Heart that the interview was voluntary, the officers had initiated contact with Brave Heart, questioned him in an interior room of the police station in a "police dominated" environment, used coercive psychological tactics, lied to Brave Heart on three occasions,[3] and, finally, arrested Brave Heart upon completion of the interview.

---

[3]It is not altogether clear what these lies encompass, but we assume that they involve de la Rocha's statements that it was not his intention to arrest Brave Heart and his attempt to give Brave Heart the impression that he had spoken with the forensic pathologist during the break in questioning.

Although the great majority of the district court's findings are not clearly erroneous,[4] we do not believe that the facts combine to undermine de la Rocha's express advice that Brave Heart's participation in the interrogation was voluntary. As our recent opinion in Czichray makes clear, the indicia of custody identified in Griffin are by no means exhaustive and should not be applied ritualistically, counting indicia which contribute to custody against those which detract. 378 F.3d at 827. Such an approach ignores the strength of certain indicia, particularly "the most obvious and effective means of demonstrating that a suspect has not been taken into custody"—an express advisement that the suspect is not under arrest and that his participation in any questioning is voluntary. Id. at 826 (quoting Griffin, 922 F.2d at 1349). Accordingly, we think that it is highly significant that de la Rocha informed Brave Heart at the outset of the interview that Brave Heart's presence was voluntary—information that Brave Heart actually understood, given his statements on the audio tape. As we noted in Czichray, no governing precedent of the Supreme Court or this court has yet held that a person was in custody after being "clearly advised of his freedom to leave or terminate questioning." Id.

In addition, we disagree with the district court that de la Rocha's alleged "lies," his expressed belief that Brave Heart was somehow responsible for Bruguier's death, and his attempt to play on Brave Heart's personal guilt support a finding that Brave Heart was in custody. The district court and the magistrate judge found that de la Rocha always intended to arrest Brave Heart at the conclusion of the interrogation; de la Rocha never disclosed this fact to Brave Heart, however, and explicitly told Brave Heart that he had no intention of arresting him. Thus, because de la Rocha did not articulate his plan to arrest Brave Heart, de la Rocha's intentions do not affect the question of whether Brave Heart was in custody during the interrogation. Griffin,

---

[4]There is no record support for the district court's finding that "the tribal police detective [LeBeau] obviously told [Brave Heart] to come to the police station and the defendant did as he was told." D. Ct. Order of June 24, 2003, at 2.

922 F.2d at 1356 (citing Berkemer v. McCarty, 468 U.S. 420, 442 (1984)). Furthermore, to the extent that de la Rocha's expressed belief regarding Brave Heart's responsibility for the crime and his misinformation regarding the timing of the pathologist's statement might be considered coercive, LeBrun suggests that "some degree of coercion is part and parcel of the interrogation process" and that "the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart." 363 F.3d at 721; see also Oregon v. Mathiason, 429 U.S. 492, 495-96 (1977) (per curiam) (false information about discovering prints at scene had "nothing to do with whether [the suspect] was in custody for purposes of the Miranda rule").

In this case, de la Rocha's accusatory questioning had little to do with how a person in Brave Heart's position would have perceived his freedom to leave, especially given that Brave Heart was not physically restrained in any way and that de la Rocha and LeBeau treated Brave Heart calmly and respectfully at all times and did not condition his ability to leave on providing any information. Although the district court found that the statement that the officers needed to make phone calls during their ten-minute break implied that Brave Heart should stay because questioning was incomplete, we do not believe that a reasonable person in Brave Heart's position would have interpreted the break and attendant statement about the need to make phone calls as constituting a message that he was not free to depart the room through the partially open door. Cf. United States v. Carter, 884 F.2d 368, 372 (8th Cir. 1989) (custody found where the suspect was explicitly told to "just stay here").

Finally, although Brave Heart's questioning occurred in a police station, the label "police dominated" belies the fact that the interview was not lengthy, see Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993) (seven-hour interview not per se unconstitutional), and was conducted by only two officers, who, as Brave Heart

agreed, had been "polite and respectful." Additionally, the questioning occurred in a relatively large room, each officer sat several feet from Brave Heart, and neither officer used a menacing tone or made any threats. See United States v. Galceran, 301 F.3d 927, 930-31 (8th Cir. 2002) (ninety-eight-minute interview in windowless conference room—as opposed to holding cell— by two officers was not police dominated).

Because we can identify no circumstances during questioning that were sufficient to make a reasonable person doubt the continued efficacy of the original advisement regarding voluntary participation, we conclude that Brave Heart was not in custody during the interrogation.

**B.**

Our decision that Brave Heart was not in custody does not end our inquiry, however, because the district court also adopted the magistrate judge's alternative finding that Brave Heart's confession, even if non-custodial, was nevertheless involuntary. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." LeBrun, 363 F.3d at 724 (citation omitted). We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure. United States v. Astello, 241 F.3d 965, 967 (8th Cir. 2001); United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995). The government must prove by a preponderance of the evidence that the defendant's statements were voluntary. LeBrun, 363 F.3d at 724. We review the district court's factual findings for clear error and its conclusion regarding the voluntariness of a confession de novo. Id.

Although there were no threats or physical violence directed toward Brave Heart, the magistrate judge found that de la Rocha's statements that it was not his intention to arrest Brave Heart amounted to implied promises which, considered with the surrounding environment and de la Rocha's use of psychological ploys, overbore Brave Heart's will and induced him to confess. We disagree.

"Even assuming that a reasonable person would view [de la Rocha's] statements as a promise, a promise made by law enforcement 'does not render a confession involuntary per se.'" LeBrun, 363 F.3d at 725 (quoting Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001)). It is simply one factor to be considered in the totality of the circumstances. Id. Here, Brave Heart specifically agreed on the audio tape that the officers had not made any threats or promises to him. Even if such promises were made, however, it is illogical to conclude that Brave Heart was motivated to confess by such promises if he did not himself acknowledge that they were made.[5] Furthermore, given the one-hour time interval between Brave Heart's eventual confession and de la Rocha's first statement that it was not his intention to arrest Brave Heart, as well as Brave Heart's initial denial of responsibility, it is difficult to discern how Brave Heart was motivated by any perceived promises.

Finally, we note that officers elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, conveying sympathy, and even using raised voices. Astello, 241 F.3d at 967-68. None of these tactics render a confession involuntary, however, unless "the overall impact of the interrogation caused the defendant's will to be

---

[5]The magistrate judge noted that Brave Heart is heard sobbing on the tape and suggests that the emotionally charged nature of his confession explains Brave Heart's failure to mention the promises, but this strikes us as a thin basis upon which to base a finding that any such promises motivated Brave Heart's confession.

-10-

overborne." <u>Jenner</u>, 982 F.2d at 334. Brave Heart is not a sophisticated man, but he is not a minor, he has completed the eleventh grade, he has had at least some prior experience with the criminal justice system, and he did not have difficulty understanding the questions put to him. These characteristics weigh in favor of the voluntariness of his confession. The record as a whole demonstrates that Brave Heart confessed because his conscience prevailed upon him to do so, not because the environment and nature of the questioning was so coercive that it overbore his will and critically impaired his capacity for self-determination.

The order suppressing the confession is reversed, and the case is remanded to the district court for further proceedings.

_____