STATE of Missouri,
Plaintiff/Respondent,

v.

Henry HILL, Defendant/Appellant.

No. ED 89196.

Missouri Court of Appeals,
Eastern District,
Division Five.

March 4, 2008.

Shaun J. Mackelprang, Assistant Attorney General, Joshua N. Corman, Jefferson City, MO, for respondent.

Nancy A. McKerrow, Columbia, MO, for appellant.

KATHIANNE KNAUP CRANE, Judge.

Defendant appeals from a judgment entered on a jury verdict finding him guilty of two counts of first-degree child molestation, in violation of Section 566.067 RSMo (2000). The trial court sentenced defendant to ten years imprisonment on each count, to be served concurrently. On appeal, defendant claims that his constitutional right to face-to-face confrontation was violated at trial when the trial court allowed the state to move a podium in the courtroom so that the two victims could not see defendant while they testified, and his constitutional right not to incriminate himself was violated when the trial court

admitted his audiotaped and videotaped confession. We hold that defendant's right to face-to-face confrontation was violated, but that the error was harmless beyond a reasonable doubt. We further hold that defendant was not "in custody" when he made his confession and *Miranda* warnings were not required. In addition defendant did not preserve for review his claim that his statements were induced by promises of leniency. We affirm.

The sufficiency of the evidence is not in dispute. Between September 21, 2004 and October 1, 2004, defendant touched the genitals of his four-year-old granddaughter, B.H., and between January 27, 2003 and January 27, 2004, defendant touched the genitals of his other four year-old granddaughter, A.C., for the purpose of arousing his own sexual desire.

## I. *Denial of Right of Confrontation*

For his first point, defendant contends that the trial court erred in allowing the prosecutor to move a podium so that the two victims could not see defendant, and defendant could not see them, while they were testifying. He maintains that this action, absent a case-specific finding that the victims would be traumatized by being forced to testify in defendant's presence, violated his right to face-to-face confrontation with his accusers.

### A. *Factual Background*

Before the prosecutor called B.H. to testify, she moved the podium so that B.H. would not be able to see defendant. Defendant objected on the ground that he was unable to see the witness stand. The prosecutor argued that B.H. had not seen defendant in two years and would be traumatized if she had to confront him in a room full of strangers. Defense counsel responded that it was not "appropriate to blockade a witness from ... a defendant, unless the Court finds that there's some

type of psychological trauma, and I think that would require some type of separate hearing." The court overruled the objections, and allowed "the podium to be placed in such a position that the defendant [could not], in fact, directly see the witness." When A.C. took the witness stand, defendant renewed his objection to the placement of the podium to block A.C.'s view of defendant, which the trial court again denied. The state did not introduce any evidence to support its claim that the victims would be traumatized and the court did not make any findings on trauma.

### B. *Standard of Review*

The question of whether a defendant's rights under the Confrontation Clause were violated by a ruling of the trial court is a question of law that we review *de novo*. *State v. March*, 216 S.W.3d 663, 664–65 (Mo. banc 2007).

### C. *Analysis*

#### 1. *Confrontation Clause Violation*

Article 1, Section 18(a) of the Missouri Constitution provides that "the accused shall have the right ... to meet the witnesses against him face to face." The Confrontation Clause of the Sixth Amendment of the United States Constitution, which the Fourteenth Amendment makes binding on the states, provides in part: "In all criminal prosecutions the accused shall enjoy the right ... to be confronted with the witnesses against him." This clause guarantees a defendant in federal and state courts "a face-to-face meeting with witnesses appearing before the trier of fact." *Coy v. Iowa*, 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988); *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

In *Coy*, a large screen was placed between the defendant and the witness stand

while the child victims of sexual assault testified. An Iowa statute allowed this procedure. The screen permitted the defendant to see the witnesses "dimly," but the witnesses could not see the defendant. The Court found the Confrontation Clause was violated because there were no individualized findings that the particular child witnesses needed this special protection. *Coy*, 487 U.S. at 1021, 108 S.Ct. 2798.

In *Maryland v. Craig*, 497 U.S. 836, 850, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), the Court reexamined *Coy* in the context of a Maryland statute that allowed a judge to receive, by one-way closed circuit television, the testimony of a child victim of abuse upon a finding by the judge that the child would suffer serious emotional distress such that the child could not reasonably communicate if the child were to be compelled to testify in the courtroom. Md.Code Ann., Cts. & Jud. Proc. section 9–102(a)(1)(ii)(1989). The Court began its analysis with the premise that the right of face-to-face confrontation was not absolute, but was not easily dispensed with. *Craig*, 497 U.S. at 850, 110 S.Ct. 3157. It found significant that the Maryland statutory procedure preserved all other elements of the right to confrontation: "The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies." *Id.* at 851, 110 S.Ct. 3157. The Court held:

> Although we are mindful of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation—oath, cross-examination, and observation of the witness' demeanor—adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing

in a manner functionally equivalent to that accorded live, in-person testimony. These safeguards of reliability and adversaries render the use of such a procedure a far cry from the undisputed prohibition of the Confrontation Clause: trial by *ex parte* affidavit or inquisition. . . .

*Id.* The Court concluded that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.* at 853, 110 S.Ct. 3157. It added:

> [I]f the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

*Id.* at 855, 110 S.Ct. 3157. The Court required that the finding of necessity be case-specific: that is, a trial court must hear evidence and determine if use of the procedure is necessary to protect the welfare of the particular child witness who is called to testify and whether the child witness would be traumatized "not by the courtroom generally, but by the presence of the defendant." *Id.* at 855–56, 110 S.Ct. 3157.

The Missouri legislature subsequently enacted section 491.680 RSMo (2000). This statute provides that in prosecutions under chapters 565, 567 and 568, a victim under the age of fourteen can testify by means of an *in-camera* videotaped deposition, and the defendant can be excluded if "the court finds, at a hearing, that significant emotional or psychological

trauma to the child which would result from testifying in the personal presence of the defendant exists, which makes the child unavailable as a witness at the time of the preliminary hearing or trial." Section 491.680.1–2. A court cannot make this finding unless it conducts a case-specific inquiry into whether the child would suffer emotional trauma if forced to testify in the defendant's presence. *Craig*, 497 U.S. at 857–58, 110 S.Ct. 3157; *Coy*, 487 U.S. at 1021, 108 S.Ct. 2798. "[A]lthough face-to-face confrontation is not an absolute constitutional requirement, it may be abridged only where there is a 'case-specific finding of necessity.'" *Craig*, 497 U.S. at 857–58, 110 S.Ct. 3157 (citations omitted).

Missouri courts have generally required that the emotional or psychological trauma be established by expert testimony. *State v. Sanders*, 126 S.W.3d 5, 15 (Mo.App.2003) (citing *Kierst v. D.D.H.*, 965 S.W.2d 932, 941–42 (Mo.App.1998)). The expert testimony does not have to come from a psychiatrist, psychologist, or physician, but may come from an experienced social worker or other person who has sufficient knowledge about such issues to provide an opinion. *State v. Naucke*, 829 S.W.2d 445, 449–50 (Mo. banc 1992); *Sanders*, 126 S.W.3d at 15 (citing *Kierst*, 965 S.W.2d at 941). "There must be some expert testimony that serious emotional or psychological trauma would result if the victim were required to testify in the presence of the defendant unless the distress of the child victim is so evident that the trial court would be competent to determine the issue itself." *Sanders*, 126 S.W.3d at 15 (citing *Kierst*, 965 S.W.2d at 941–42). The state must produce at a hearing sufficient evidence to establish the emotional and psychological trauma the child would suffer if forced to testify in the defendant's presence. *State v. Sanchez*, 752 S.W.2d 319, 322–23 (Mo. banc 1988). Trauma may not be established merely by "'knowledge of the child's age and the sensitive nature of the subject involved.'" *Sanders*, 126 S.W.3d at 16 (quoting *Kierst*, 965 S.W.2d at 941).

Defendant argues that although this case does not arise under section 491.680, the same case-specific finding of necessity should have been made before the podium was moved. No Missouri statute approves of or provides a procedure for moving a podium in this situation. It is clear that moving a podium to block a defendant's and a child witness's view of each other is virtually similar to the use of the screen for the same purpose in *Coy*, and *Craig* would require a finding of emotional and psychological trauma based on evidence. *See Coy*, 487 U.S. at 1021, 108 S.Ct. 2798; *Craig*, 497 U.S. at 845, 110 S.Ct. 3157.[1] In the absence of any evidence or findings that the victims would suffer emotional or psychological trauma if made to testify without obstruction of their view of defendant or defendant's view of them, defendant's right to a face-to-face confrontation was violated.

### 2. Harmless Error

The state alternatively argues that if there was a violation of the confrontation clause, it was harmless beyond a reasonable doubt. Violations of the Confrontation Clause created by denying face-to-face confrontation are subject to harmless-error analysis. *Coy*, 487 U.S. at 1021, 108 S.Ct. 2798. We determine whether a constitutional error is harmless by decid-

---

1. The state has referred us to *Guese v. State*, —— S.W.3d —— (Mo.App.2008), in which the Southern District determined that a similar procedure did not violate the confrontation clause, and thus did not require counsel to make an objection. This opinion was not final at the time this case was handed down.

ing "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Driscoll,* 55 S.W.3d 350, 356 (Mo. banc 2001) (quoting *Neder v. United States,* 527 U.S. 1, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). We evaluate harmlessness by reviewing the remaining evidence. *Coy,* 487 U.S. at 1021–22, 108 S.Ct. 2798. Here, the remaining evidence clearly demonstrates that any alleged error was harmless beyond a reasonable doubt.

There is sufficient evidence apart from B.H.'s and A.C.'s trial testimony to support a finding that defendant molested B.H. and A.C. In his videotaped confession, defendant admitted to Corporal Branham that he had touched A.C.'s vagina twice, and B.H.'s once. In addition, after A.C.'s mother became aware of defendant's confession to Corporal Branham, she confronted defendant. He was crying and immediately began apologizing. Defendant said that he just had an urge and could not stop it.

B.H.'s parents, a nurse practioner, and Corporal Branham each testified that B.H. told them that defendant had touched her vagina with his middle and index fingers. B.H.'s father testified that B.H. told him this occurred while defendant was reading her a story on the front porch of his house. A.C.'s mother and a Child Advocacy Center (CAC) interview specialist testified that A.C. told them that defendant touched her vagina while she was in his living room. The CAC interview specialist also testified that A.C. told her defendant touched her after pulling her pants part way down while she was lying across his lap.

Defendant responds that inconsistencies in B.H.'s and A.C.'s out-of-court statements refute a finding of harmlessness beyond a reasonable doubt. We disagree.

[I]n cases involving such young victims and sensitive and embarrassing subject matters, "it is common for the testimony of a victim of tender years to contain some variations, contradictions or lapses in memory." Inconsistencies or contradictions in statements by a young child relating a sexual experience do not, by themselves, deprive the statement of all probative force.

*State v. Mattic,* 84 S.W.3d 161, 169 (Mo. App.2002) (citations omitted) (reviewing statements by nine and ten-year-old girls).

Here, the inconsistencies were minor. B.H. denied any touching to the CAC specialist. However, prior to that, B.H. consistently reported touching to both of her parents and Corporal Branham. A.C. did not admit to her molestation for two years and was unsure whether defendant touched her vagina or anus. However, all of the other details A.C. gave about the manner of touching and the locations where it occurred were consistent. The minor inconsistencies did not deprive the victims' out-of-court statements of probative value.

The totality of the evidence other than B.H.'s and A.C.'s courtroom testimony establishes sufficient evidence of guilt. On this record, the confrontation clause violation was harmless beyond a reasonable doubt. Point one is denied.

## II. *Admission of Statements*

In his second point, defendant asserts that the trial court erred in overruling his motion to suppress the statements he made to Corporal Branham and in overruling his objections to the admission of those statements into evidence. He argues that the statements should have been suppressed because they were taken when he was in custody and had not been given *Miranda* warnings. He further argues

they were inadmissible because they were involuntary in that they were induced by promises of leniency.[2]

A. *Factual and Procedural Background*

On October 20, 2004, a few weeks after he met with B.H. and her family about B.H.'s report that defendant had touched her vagina with his fingers, Corporal Branham telephoned defendant and asked him to come to the police station for a voluntary interview. Defendant reported that he had already learned of the allegation from his son and agreed to come in. He arrived at the police station with his wife shortly thereafter. Corporal Branham met defendant and his wife in the lobby. He introduced himself as a police officer. He was not wearing a uniform, but he had an exposed firearm and handcuffs on his person. He advised defendant's wife that she could not go to the interview room and that she should wait in the lobby.

Corporal Branham then escorted defendant to a second floor interview room. The interview room itself was approximately 8 by 10 feet, had no outside windows, but had a window in the door. Corporal Branham removed his firearm prior to the interview.

He began the interview by saying, "Wanna sit right there for me. Thanks for coming up so quick." Defendant responded "It's okay. I wasn't doing anything." Corporal Branham informed defendant that he was not under arrest; that the door was unlocked; and that he was "free to go" if he wanted to leave. Defendant replied that he understood.

After approximately forty minutes, defendant asked to use the restroom. Corporal Branham replied, "I can take you downstairs to use the restroom, but we have to come right back up and talk." Corporal Branham testified that he escorted defendant to the restroom because they were in a secure police building and "civilians [could not] be left unattended at any time." The standard policy required subjects who were being interviewed to use a bathroom inside of a jail cell. Corporal Branham stood outside of the cell while defendant used the restroom. Corporal Branham escorted defendant back to the interview room. They did not converse on their way to or from the restroom.

After defendant returned to the interview room, Corporal Branham asked him if he needed anything and said, "Have a seat." He left defendant in the interview room alone with the door closed. After two minutes Corporal Branham returned and said, "Sorry about that. How are you doing?" He continued the interview. Approximately fifteen minutes later, defendant admitted that he had rubbed the outside of B.H.'s vagina and the inside of A.C.'s vagina with his fingers.

At the end of the interview, Corporal Branham told defendant he was going to give him a couple of minutes by himself, and then "we'll get you out of here," unless defendant was ready to go immediately. Defendant answered he was not ready, so Corporal Branham left the room. When he returned he asked defendant if he was ready to go home, and defendant indicated he was.

After the interview, defendant was escorted to the lobby where his wife was

---

**2.** In the argument section of his brief, defendant adds a third claim that Corporal Branham had probable cause to arrest him and that therefore the interrogation should be considered custodial. This issue has not been preserved for appeal because this argument was raised for the first time on appeal, and because it was not included in defendant's point relied on. *Yates v. State,* 158 S.W.3d 798, 802 n. 3 (Mo.App.2005).

waiting. He was not detained, fingerprinted, processed, or booked, and no arrest was made. Corporal Branham planned to forward a report to the prosecuting attorney's office.

Defendant filed a motion to suppress his statements, which the trial court denied after a hearing. The court found that Corporal Branham's testimony was credible and concluded that defendant was not subjected to a custodial interrogation and defendant's statements were voluntary. The trial court overruled defendant's objection to the testimony at trial.

### B. Standard of Review

We review a trial court's ruling on a motion to suppress to determine if it is supported by substantial evidence. *State v. Johnson*, 207 S.W.3d 24, 44 (Mo. banc 2006). We view the facts and the reasonable inferences therefrom in the light most favorable to the ruling and defer to the trial court's resolution of the weight of the evidence and the credibility of witnesses. *Id.* We review questions of law *de novo*. *State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000). We will not reverse a trial court's decision on a motion to suppress unless it is clearly erroneous. *Johnson*, 207 S.W.3d at 44.

### C. Preservation of Error

Rule 30.06(c) provides that in appeals from criminal matters, the statement of facts, points relied on, argument, and appendix shall be prepared as directed by Rule 84.04. The requirements of Rule 84.04 are both mandatory and essential in that they enable the appellate courts to function smoothly and effectively. *State v. Jones*, 786 S.W.2d 926, 927 (Mo.App.1990). "An argument should demonstrate how the principles of law and the facts of the case interact." *State v. Franke*, 234 S.W.3d 484, 485 (Mo.App.2007). An argument must include citations to relevant legal authority supporting each proposition of law for which legal authority is available. Rule 84.04(d) and (e); *State v. Danback*, 886 S.W.2d 204, 208 (Mo.App.1994). Furthermore, Rule 84.04(i) mandates that "[a]ll statements of fact and argument shall have specific page references to the legal file or the transcript." Rule 84.04(i); *Franke*, 234 S.W.3d at 486. *See also* Rule 30.06(e). Failure to comply with Rule 84.04 leaves nothing for appellate review. *Franke*, 234 S.W.3d at 486.

### D. Analysis

#### 1. Whether Defendant was "In Custody"

Defendant first claims his statements were inadmissible because he was "in custody" at the time of his interview and was not advised of his Fifth Amendment rights. Statements given by a suspect stemming from custodial interrogation are inadmissible on the issue of the suspect's guilt of the charged offense, unless he or she has been informed of his or her rights under the Fifth Amendment. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id. See also State v. Glass*, 136 S.W.3d 496, 511 (Mo. banc 2004). However, if there has been no arrest or arrest-like restraints, " 'questioning that takes place in a coercive environment does not require *Miranda* warnings.' " *Glass*, 136 S.W.3d at 511 (quoting *State v. Feltrop*, 803 S.W.2d 1, 13 (Mo. banc 1991)).

#### a. The Werner/Griffin Factors

Both defendant and the state have briefed the "in custody" question by examining and weighing the individual factors identified in *Werner*, 9 S.W.3d at 595, to

analyze whether defendant was "in custody." This is the approach that has been routinely used by the courts of appeals in Missouri. However, after *Werner*, it has not been used by the Missouri Supreme Court, and more recently it has been criticized and abandoned by the Eighth Circuit Court of Appeals from which it came.

In *Werner*, the Missouri Supreme Court adopted a procedure for determining custody from *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir.1990). *Griffin* began with the accepted premise that the custody determination "arises from an examination of the totality of the circumstances." *Id.* at 1347. *Griffin* then attempted to synthesize from other cases common indicia of custody, which it identified and listed as follows:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

922 F.2d at 1349. *Griffin* described these factors as "non-exhaustive," but "influential," and characterized the first three factors as tending to mitigate the existence of custody, and the last three factors as tending to aggravate the existence of custody. *Id.* It held that "a particularly strong showing with respect to one factor may compensate for a deficiency with respect to other factors." *Id.* It emphasized that its list of factors "is merely intended to be representative of those indicia of custody" most often used by courts when they analyze the totality of the circumstances. *Id.* *Griffin* then proceeded to discuss and apply each listed factor individually to reach its result.

In *Werner*, the Missouri Supreme Court set out the *Griffin* analysis and the six indicia of custody listed therein. 9 S.W.3d at 595–96. It also emphasized that the custody determination was not limited to the six factors listed in *Griffin*, but their "presence and absence guide courts in assessing the totality of the circumstances surrounding interrogations." *Id.* at 596.

Although both *Griffin* and *Werner* admonished that the list of six factors was only representative and not exhaustive, opinions thereafter have used the six factors to analyze custody. In *United States v. Mottl*, 946 F.2d 1366, 1369 (8th Cir. 1991), the court indicated: "We are bound, however, by the analysis set forth in *Griffin*, in which this court isolated six 'common indicia of custody.' *Griffin*, 922 F.2d at 1349. The 'indicia of custody' inquiry focuses on tactics employed by the police during questioning 'which tend to either mitigate or aggravate an atmosphere of custodial interrogation.'" The courts of appeals in Missouri have since analyzed the custody determination by routinely referencing the six factors, whether by limiting the analysis to the six factors, *see, e.g., State v. Taylor*, 109 S.W.3d 190, 192–93 (Mo.App.2003), or by mentioning them in the context of a broader analysis. *See, e.g., State v. Sardeson*, 220 S.W.3d 458, 465–70 (Mo.App.2007); *State v. Brooks*, 185 S.W.3d 265, 274–75 (Mo.App.2006).

The Eighth Circuit followed *Griffin* until its decision in *United States v. LeBrun*, 363 F.3d 715 (8th Cir.2004) (en banc), *cert. denied*, 543 U.S. 1145, 125 S.Ct. 1292, 161

L.Ed.2d 105 (2005). In *LeBrun,* the court analyzed the question of whether a person was "in custody," without citing *Griffin* or listing the *Griffin* factors. Instead it held:

> The "ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (internal marks omitted). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson,* 516 U.S. at 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (footnote omitted). Thus, the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's "freedom to depart was restricted in any way." *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711, 50 L.Ed.2d 714. In answering this question, we look at the totality of the circumstances while keeping in mind that the determination is based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 322–23, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

363 F.3d at 720.

*LeBrun* was followed by *United States v. Czichray,* 378 F.3d 822 (8th Cir.2004), *cert. denied,* 544 U.S. 1060, 125 S.Ct. 2514, 161 L.Ed.2d 1109 (2005). In *Czichray,* the Eighth Circuit specifically addressed the district court's use of the *Griffin* analysis and questioned its utility in determining the existence of custody. It held:

Although the "non-exhaustive" *Griffin* factors and their attendant balancing test are often cited in our decisions concerning *Miranda,* we recently resolved the question of "custody" as an *en banc* court with nary a mention of *Griffin. See United States v. LeBrun,* 363 F.3d 715, 719–24 (8th Cir.2004) (en banc). There is no requirement, therefore, that the *Griffin* analysis be followed ritualistically in every *Miranda* case. When the factors are invoked, it is important to recall that they are not by any means exclusive, and that "custody" cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly. Exploring the nuances of such vague factors as "voluntary acquiescence," "strong arm tactics," and "police-dominated atmosphere" in order to place them on one side or the other of a balancing scale may tend to lose sight of the forest for the trees. The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest. And the court must consider whether the *historical facts,* as opposed to the one-step-removed *Griffin* factors, establish custody. The debatable marginal presence of certain judicially-created factors that ostensibly tend to "aggravate the existence of custody" cannot create the functional equivalent of formal arrest where the most important circumstances show its absence.

378 F.3d at 827–28.

In *United States v. Brave Heart,* 397 F.3d 1035 (8th Cir.2005), the court again criticized the ritualistic approach inspired by *Griffin:*

> As our recent opinion in *Czichray* makes clear, the indicia of custody identified in *Griffin* are by no means exhaustive and should not be applied ritualistically,

counting indicia which contribute to custody against those which detract. 378 F.3d at 827. Such an approach ignores the strength of certain indicia, particularly "the most obvious and effective means of demonstrating that a suspect has not been taken into custody"—an express advisement that the suspect is not under arrest and that his participation in any questioning is voluntary. *Id.* at 826 (quoting *Griffin,* 922 F.2d at 1349).

397 F.3d at 1039. And, in *United States v. Ollie,* 442 F.3d 1135 (8th Cir.2006), the court reiterated:

> It is important to note that a decision on the matter of custody requires more than tallying a ledger. Where one criterion is particularly influential, the failure to find other indicia of custody is not necessarily fatal. In the end, these criteria are only useful tools meant to focus attention. The ultimate decision requires a hard look at all of the circumstances.

442 F.3d at 1140.

During the three month interval after *LeBrun* was handed down and before *Czichray* was handed down, our supreme court decided *Glass.* In *Glass,* the court analyzed the question of whether a suspect was "in custody" for *Miranda* purposes without citing *Werner* or listing the *Griffin/Werner* factors.[3] *Glass,* 136 S.W.3d at 508–09, 510–11. Rather, it cited the pre-*Werner* case of *Feltrop,* which found no custody by simply considering restraints on liberty pursuant to *Oregon v. Mathiason,* 429 U.S. 492, 494–95, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

■ Thus, it is clear that it is not necessary or even always appropriate to determine custody by weighing the presence or absence of the six *Griffin/Werner* factors in each case. Rather, we look at the totality of the circumstances.

b. *Totality of the Circumstances*

■ Custody is determined by an analysis of the totality of the circumstances. *Werner,* 9 S.W.3d at 595–96. "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The court "must apply an objective test to resolve 'the ultimate inquiry': '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.'" *Id.* (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711)). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California,* 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). The objective, reasonable person test is appropriate because it does not place on the police "'the burden of anticipating the frailties or idiosyncrasies of every person whom they question.'" *Berkemer v. McCarty,* 468 U.S. 420, 442 n. 35, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting *Peo-*

---

**3.** We also note that the court has cited *Werner* for the "totality of the circumstances" test in two cases considering seizures under the Fourth Amendment, but has not specifically referred to the six factors. *State v. Sund,* 215 S.W.3d 719 (Mo. banc 2007); *State v. Barks,* 128 S.W.3d 513 (Mo. banc 2004).

*ple v. P.,* 21 N.Y.2d 1, 286 N.Y.S.2d 225, 233 N.E.2d 255, 260 (1967)).

We begin by identifying the circumstances. Defendant voluntarily drove with his wife to the police station, and his wife waited for him while he was interviewed. Corporal Branham began the interview by thanking defendant for coming, telling defendant that the door was not locked, he was not under arrest, and he was free to go if he wanted to leave. Defendant was not handcuffed, or otherwise physically restrained, and was allowed to use the bathroom. Corporal Branham was not in uniform and took off his firearm. The interview lasted only an hour. Corporal Branham was polite and respectful. Defendant was not arrested at the termination of the interview, rather defendant was given the opportunity to decide when he was ready to leave, and chose to stay until he was ready to leave.

 We next consider if a reasonable person in these circumstances would have felt at liberty to terminate or leave the interrogation. The "most obvious and effective means of demonstrating that a suspect has not been 'taken into custody or otherwise deprived of ∴.. freedom of action,' *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612, is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." *Griffin,* 922 F.2d at 1349, *quoted in Werner,* 9 S.W.3d at 596; *see also Czichray,* 378 F.3d at 826; *Brave Heart,* 397 F.3d at 1039. In addition, a person who voluntarily goes to a police station for questioning is not subject to arrest-like restraints. *Glass,* 136 S.W.3d at 509; *Feltrop,* 803 S.W.2d at 13. The lack of physical restraints and the freedom to attend to physical needs shows that a reasonable person in defendant's situation would not have felt that he was not free to leave. *See Glass,* 136 S.W.3d at 509; *LeBrun,* 363

F.3d at 722. The fact that a police officer is not armed during the interview is an indication that the situation is not one of custody. *Glass,* 136 S.W.3d at 509; *Sardeson,* 220 S.W.3d at 462. Treatment "with the consideration due one who has volunteered to be interviewed" is the " 'kind of latitude [that] is clearly inconsistent with custodial interrogation.' " *Feltrop v. Bowersox,* 91 F.3d 1178, 1182 (8th Cir.1996) (quoting *United States v. Jorgensen,* 871 F.2d 725, 729 (8th Cir.1989)), *cert. denied,* 520 U.S. 1242, 117 S.Ct. 1849 (1997). *See also Brave Heart,* 397 F.3d at 1040. The fact that an interview is of short duration also indicates that there has not been a restraint consistent with formal arrest. *Brave Heart,* 397 F.3d at 1040; *Thatsaphone v. Weber,* 137 F.3d 1041, 1045 (8th Cir.1998), *cert. denied,* 523 U.S. 1130, 118 S.Ct. 1822, 140 L.Ed.2d 958 (1998).

The United States Supreme Court has specifically held that a suspect is not in custody in the situation in which the suspect voluntarily goes to a police station for questioning, is told that he or she is not under arrest, is not physically restrained, and is not arrested at the end of the interview. *See Beheler,* 463 U.S. at 1124–25, 103 S.Ct. 3517; *Mathiason,* 429 U.S. at 494–95, 97 S.Ct. 711. *See also Brave Heart,* 397 F.3d at 1038–40; *LeBrun,* 363 F.3d at 720–23; *Thatsaphone,* 137 F.3d at 1044–46. Further, the result is the same even if the police interview the suspect in a windowless room or use deceptive strategisms or psychological ploys during the interview to get the suspect to confess. *Mathiason,* 429 U.S. at 495–96, 97 S.Ct. 711; *Sardeson,* 220 S.W.3d at 468; *Brave Heart,* 397 F.3d at 1041; *LeBrun,* 363 F.3d at 722. And, in *Sardeson,* 220 S.W.3d at 468–69, the court reached the same result in these circumstances even though the interview ended in an arrest.

Defendant argues that the following facts demonstrate that he was in custody: The interview took place in a police station; after he was told he was not under arrest and free to go, the officer said, "We need to talk about this and get it straightened out;" after he asked to use the bathroom, the officer said, "But we have to come right back up and talk;" he was escorted to a jail cell bathroom by a policeman who stood guard; the officer made misleading statements and promises of leniency; and he was 64, had an eighth grade education, and worked as a custodian. We consider each of these in turn.

*Police Station*

 The fact that the interview took place in a police station does not demonstrate custody. *Miranda* warnings are not required simply because the questioning takes place in a police station. *Beheler,* 463 U.S. at 1125, 103 S.Ct. 3517; *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711; *Glass,* 136 S.W.3d at 509, 510–11; *Feltrop,* 803 S.W.2d at 13; *Brave Heart,* 397 F.3d at 1040; *LeBrun,* 363 F.3d at 720; *Thatsaphone,* 137 F.3d at 1045. This is because "the critical inquiry is not whether the interview took place in a coercive or police dominated environment, but rather whether the defendant's 'freedom to depart was restricted in any way.'" *LeBrun,* 363 F.3d at 720 (quoting *Mathiason,* 429 U:S. at 495, 97 S.Ct. 711); *see also Glass,* 136 S.W.3d at 511; *Feltrop,* 803 S.W.2d at 13. "If a person is free to go at any time prior to the actual arrest, then the person is not under 'arrest.'" *Glass,* 136 S.W.3d at 509.

*Statements to Defendant*

 Defendant next claims that two of Corporal Branham's statements during the interview turned the interview into a custodial one. Defendant does not provide any legal authority or legal analysis supporting his claim that these two comments made him believe he was subject to arrest-like restraints and therefore fails to preserve it for review. Rule 84.04(d)(1)(C); *Franke,* 234 S.W.3d at 485–86. We have, nevertheless, reviewed these claims *ex gratia.*

Defendant first argues that Corporal Branham's initial advice that he was free to go was undercut because Corporal Branham immediately added, "but you need to talk with me." The record of the interview discloses that actual conversation was:

Q Okay. The first thing I want to tell you (inaudible) this door's not locked, you're under not under arrest or anything, okay? You're free to go if you want to leave.

A. Okay.

Q. We need to talk about this and get it straightened out.

A. Right.

Q. Okay? You understand all that?

A. Right.

In this context, there is no indication defendant did not continue to understand that he was free to leave after Corporal Branham said, "we need to talk about this." Rather, it shows that defendant agreed that they needed to talk, and he understood "all that."

 Defendant next points to the fact that when Corporal Branham told defendant that he could take him downstairs to use the restroom, he added, "but we have to come right back up and talk." This statement must be viewed in context. Just before defendant asked to use the bathroom, Corporal Branham was in the process of encouraging defendant to talk in order to not put his family through more of an ordeal, and said that this was their "one chance to talk." Defendant agreed that he did not want to put his family through an ordeal. Defendant next said

that he needed to use the restroom. Corporal Branham answered: "Okay. We can do that. I can take you downstairs to use the restroom, but we have to come right back up and talk." Defendant responded, "Okay." The context in which Corporal Branham's statement about talking was made, and defendant's response, "Okay," indicate no more than that Corporal Branham was trying to persuade him to complete the interview and defendant agreed. *See State v. Brooks,* 185 S.W.3d at 277. There is no indication that a reasonable person in defendant's situation would no longer believe he had right to leave or terminate the interview at that point.

### Escort to Jail Cell Bathroom

█ The fact that Corporal Branham escorted defendant to a restroom and stood guard while he used a jail cell toilet does not demonstrate arrest-like restraints in this case. Corporal Branham, whom the court found credible, explained that he escorted defendant because they were inside a police station and civilians could not be left unattended. He also testified that the use of the jail cell toilet was standard policy. *Werner* recognized that "suspects are often escorted or chaperoned during questioning for reasons unrelated to custody." 9 S.W.3d at 596 (citing *Griffin,* 922 F.2d at 1350).

### Misleading Statements About Evidence

█ Defendant's claim that during the first part of the interrogation, Corporal Branham made misleading statements to induce him to confess does not affect the custody determination.[4] False statements made to defendants during interrogation

about the existence of inculpatory evidence are not relevant to a determination of whether a suspect is "in custody." *Mathiason,* 429 U.S. at 495–96, 97 S.Ct. 711 (officer told the defendant his fingerprints were found on the crime scene). Rather, such statements are examined to determine if they have caused a defendant's confession to be involuntary, and therefore, inadmissible. *See State v. Simmons,* 944 S.W.2d 165, 176 (Mo. banc 1997); *State v. Davis,* 980 S.W.2d 92, 96 (Mo.App.1998). Defendant has not argued that the false statement rendered his confession involuntary, and both *Simmons* and *Davis* make clear that it would not be inadmissible in these circumstances.

### Implicit Promises of Leniency

█ Defendant also claims in his brief that after defendant returned from the restroom, Corporal Branham made implicit promises of leniency, listing the following statements:

— a lot of people loved him and just wanted to get through this one way and that's by getting through this and you saying you're sorry and if there's anything we can do for you, we'll do it.

— there's a lot of people who love you and care about you and want this to be over but we can't do that until you talk to me.

— what do you think is going to happen? Right now it's going to go to the prosecuting attorney and judge and all the people I've been talking about are going to have to go to court and talk about it and I'm trying to avoid that. I don't want that to happen.

---

**4.** Defendant does not identify or describe these statements in his brief, or make any attempt to show how relevant principles of law apply to these statements. Rather he merely cites a page in the transcript. This argument is so unsubstantiated, it fails to preserve anything for review. *Franke,* 234 S.W.3d at 485–86. We have, however, *ex gratia* reviewed the page cited in the transcript, which discloses that Corporal Branham attributed a statement to one of the victims that that victim did not make.

— I want you to be honest with me about what happened and if we can avoid all that and if we can we will, but right now you're not giving me any options, I don't have any choice. This is going to the prosecuting attorney regardless but what happens with it from that point on then depends on how you want to cooperate. I don't want to stick all these kids up there.

— the only thing that's gonna keep that from happening is honesty.

■ Defendant does not support these statements with any references to the record, and defendant provides no legal authority or analysis supporting his conclusion that promises of leniency are an indicia of custody or that these statements caused him to be "in custody." In this situation, there is nothing to review. *Franke*, 234 S.W.3d at 485–86.

■ We have, however, *ex gratia* reviewed the statements as they appear in the brief and do not find that they are not relevant to the custody analysis. These statements do not constitute promises of leniency. Rather, they are statements about the causes and consequences of the investigation and its effect on family members. "It is appropriate for an investigator to advise a suspect of the potential course and consequences of a criminal investigation. Suspects frequently confront difficult decisions about whether to defend against potential criminal charges or to pursue resolutions that may ameliorate

certain unpleasant consequences." *Czichray*, 378 F.3d at 829.

*Personal Traits*

■ Defendant also argues that we "must" consider his "personal background, experience, familiarity with police questioning, maturity, education, and intelligence," citing *Werner*, 9 S.W.3d at 596.[5] Defendant argues that he was 64, had an eighth grade education, and had no previous encounters with law enforcement. Whether these personal traits are relevant under the objective test has been questioned.[6] In any event, defendant does not provide any citations to the record for the source of these facts and provides no argument or legal authority explaining how these facts affected his understanding of the advice that he was not under arrest and was free to go. Accordingly, this issue is not preserved for review. *Franke*, 234 S.W.3d at 485–86.

*Conclusion*

■ The totality of the circumstances surrounding defendant's interview compels the conclusion that a reasonable person in defendant's position would not have understood the situation to be one of custody. Here a reasonable person, who voluntarily came to the police station for an interview, who was told he was not under arrest and could leave if he wanted, whose wife was waiting for him in the lobby of the station, who was not physically restrained, and who was treated politely, was allowed a

5. *Werner* actually says that courts "may," not "must," consider these personal traits of a defendant. 9 S.W.3d at 596, 598.

6. *Werner* held these traits were relevant, citing *U.S. v. Zahrey*, 963 F.Supp. 1273, 1278 (E.D.N.Y.1997). *Werner*, 9 S.W.3d at 596, 598. The Western District has held that an adult defendant's personal traits are not relevant under an objective test because the ob-

jective test does not " 'place upon the police the burden of anticipating the frailties or idiosyncrasies of every person they question.' " *Brooks*, 185 S.W.3d at 278 (quoting *Berkemer*, 468 U.S. at 442, 104 S.Ct. 3138). It distinguished *Werner* because the defendant in *Werner* was a juvenile, and it observed that the Missouri Supreme Court did not repeat this statement in *Glass*. *Id.* at 278.

bathroom break, was interviewed by only one officer who had removed his weapon, was interviewed for approximately one hour, was not arrested at the end of the interview, and elected to stay a few minutes, rather than leave immediately, would not have considered his freedom of action restricted to the degree associated with a formal arrest. The circumstances of this case fall squarely within *Mathiason,* 429 U.S. at 494–95, 97 S.Ct. 711 and *Beheler,* 463 U.S. at 1122–25, 103 S.Ct. 3517, and the cases that have applied them. The trial court did not err in finding defendant was not "in custody" and in denying the motion to suppress.

2. *Whether the Statements Were Involuntary*

■ Defendant also contends in this point that his statements were inadmissible as involuntary because they were induced by promises of leniency. He argues, without any citation to the record, that Corporal Branham

> was promising him was that if he was "honest" and admitted what he was accused of, everything would be over, the family would welcome him back and get him whatever help he wanted. At the very least Branham implied that Mr. Hill's "cooperation" would be taken into account by the prosecuting attorney when the time came to decide how to handle the case.

Because defendant fails to provide references to the record, this error is not preserved. Rule 84.04(i), Rule 30.06(e); *Franke,* 234 S.W.3d at 486. In defendant's reply brief, he claims that the appropriate citations to the record for these statements appear in another part of the brief. We do not find this to be the case. For example, he claims the "explicit promises of leniency" are set out eight pages earlier in the brief, but none of those statements have citations to the record. Even if citations

to the record for this passage had appeared elsewhere in the brief, Rule 84.04(i) and Rule 30.06(e) require *all* statements of a fact be supported by specific page references to the record.

■ We will not review a claim of plain error under Rule 30.20 unless there are substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. *State v. Chaney,* 967 S.W.2d 47, 59 (Mo. banc 1998), *cert. denied,* 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998). There are no extraordinary circumstances in this case to justify reviewing this argument as a matter of plain error. *State v. Mosley,* 980 S.W.2d 1, 3 (Mo.App.1998).

For all of the above reasons, point two is denied.

*Conclusion*

The judgment of the trial court is affirmed.

PATRICIA L. COHEN, C.J., and LAWRENCE E. MOONEY, J., concur.